IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CRYSTAL WEAVER,

                Plaintiff,

       v.

NETFLIX, INC., a Delaware corporation

                Defendant.

CV-10-1118-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Crystal Weaver ("Weaver"),[1] originally filed this case in Multnomah County

Circuit Court on or about August 18, 2010. Notice of Removal, ¶ 2, and Summons and

Complaint in *Gorman v. Netflix, Inc.*, Multnomah County Circuit Court Case No. 1008-12107.

---

[1] Weaver is plaintiff's maiden name. She used her married name, Gorman, as her surname during part of her employment and when she filed this case. However, she now uses the surname Weaver and the parties have agreed to change the caption to reflect her current surname. Order (docket # 27).

Weaver alleges statutory claims against her former employer, Netflix, Inc. ("Netflix"), for violations of the federal Family and Medical Leave Act ("FMLA"), 29 USC §§ 2601-2654, and its state law counterpart, the Oregon Family Medical Leave Act ("OFLA"), ORS 659A .150-.186. She also alleges a related state common law claim for wrongful discharge.

On September 17, 2010, Netflix filed a Notice of Removal to this court, alleging both federal question and diversity jurisdiction. Weaver is a citizen of Oregon. Complaint, ¶ 1. Netflix is incorporated in Delaware and has its principal place of business in California. Notice of Removal, ¶ 3. The amount in controversy exceeds $75,0000. This court has federal question jurisdiction over Weaver's federal statutory claim under the FMLA pursuant to 28 USC § 1331 and supplemental jurisdiction over Weaver's related state law claims pursuant to 28 USC § 1367(a), as well as diversity jurisdiction under 28 USC § 1332.

Netflix has now filed a Motion for Summary Judgment (docket #13) against each of Weaver's three claims. For the reasons that follow, that motion should be denied.

## STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court views the evidence most favorably to Weaver. A review of the parties' submissions[2] reveals the following facts:

### I. Initial Employment and Promotions

Netflix hired Weaver on February 27, 2007, as a Customer Service Representative ("CSR") at its call center in Hillsboro, Oregon. Weaver Decl., ¶ 2. She was promoted to Disposition Representative in November 2007 and to Disposition Point of Contact in April 2008.

---

[2] The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

*Id*.  In April 2009, she was promoted to a Customer Service Coordinator position and was
responsible for answering questions of customer service representatives and collecting call data
for reports on call center productivity.  *Id*.  Her supervisor, Lisa Peabody, rated her job
performance as "great."  *Id*.

In May 2009, Netflix promoted Weaver again into the newly created position of
Customer Service Supervisor ("CSS").  *Id*, ¶ 3; Gorman Depo., p. 40.  Weaver moved to the day
shift and, as a CSS 1, supervised a team of five to ten CSRs and began reporting to Team
Manager, Kay Villanueva ("Villanueva"), who supervised eight CSSs, including Weaver.  *Id*,
pp. 37, 40-41; Weaver Decl., ¶ 5; Villanueva Decl., ¶ 3.  At that time, the call center had
approximately 400 employees with at least 20 to 25 CSSs, each of whom managed from five to
ten CSRs.  Weaver Decl., ¶ 3.

Weaver was primarily responsible for listening to the CSRs' calls; monitoring and
analyzing data regarding inbound customer calls and evaluating the success of each customer
interaction (measured by customer satisfaction surveys); and coaching the CSRs on how to
improve performance in each of these areas.  Gorman Depo., p. 43, Ex. 5.  CSRs were expected
to meet minimum performance standards in areas of customer satisfaction rating, call length (or
"handle time"), and availability.  *Id*.  Weaver's performance, in turn, was measured, in part, on
the success of her team's collective performance.  Villanueva Decl., ¶ 3.

## II.  2009 Leave Requests

Shortly after being promoted to CSS, Weaver was married.  Gorman Depo., p. 92.  About
six weeks before the promotion, she requested time off for her wedding and honeymoon.  *Id*.  All

time off was approved by her supervisor and, because it fell during a training period for her new position, her training was split between two weeks in May 2009.

At the end of November 2009, Weaver requested and was granted vacation time from November 28 to December 9, 2009.  Gorman Depo., p. 96.  The period between late November and February is Netflix's busy season when CSRs are not permitted to use personal or vacation leave and, in general, work mandatory overtime each week.  *Id* at 58; Villanueva Decl., ¶ 9.  Weaver's supervisor, Villanueva, approved the leave.  However, when Weaver returned from that leave, Villanueva told Weaver she would not approve any additional time off.  Weaver Decl., ¶ 9.

### III.  January 2010 Review

On January 20, 2010, Villanueva met with Weaver as part of a review process with all CSSs on her team.  *Id*, ¶ 11.  Prior to that meeting, Villanueva sent an email to Skye Mercer ("Mercer"), the Human Resources ("HR") Manager of Netflix's Hillsboro, Oregon, call center, advising that she intended to have a "direct conversation" that day with Weaver "that she will need to improve her performance as a Supervisor, just in case she reaches out to HR."  Mercer Decl., ¶¶ 1, 3, Ex. A.

In these meetings with the CSSs, including Weaver, Villanueva discussed what they were doing well, what improvements were needed, how they thought they were doing, and their goals.  *Id*.  She also asked each CSS to "take a deeper dive" to improve their performance.  Gorman Depo., pp. 78-79; Weaver Decl., ¶ 12.  Villanueva told Weaver that since she went out on approved vacation, she could not have any additional time off work.  Gorman Depo, p. 90; Weaver Decl., ¶ 13.  Although she questioned Weaver's judgment for taking vacation, she never

5 - FINDINGS AND RECOMMENDATION

suggested that Weaver's employment was in jeopardy.  Weaver Decl., ¶¶ 12-13.  In her notes of

that meeting, Villanueva listed a number of areas where Weaver could improve her performance,

including "Attendance - judgment."  Villanueva Decl., Ex. D.

      After the January 20 meeting, Weaver began meeting with Villaneuva twice weekly for

extra coaching.  Gorman Depo., p. 84.

**IV.  February 2010 – Headaches and Termination Recommendation**

      In February 2010, Weaver began experiencing severe headaches.  Weaver Decl., ¶ 15.

She made Villanueva aware of this problem, but the record does not reveal the exact date.  *Id*;

Villanueva Depo., p. 31.

      Melissa O'Keefe ("O'Keefe") was the the Site Director of Netflix's Hillsboro, Oregon,

call center during 2009 and 2010.  O'Keefe Decl., ¶ 1.  Some time in February 2010, Villanueva

recommended to O'Keefe that Weaver be terminated because her performance was not

improving and, despite regular counseling, her performance metrics were consistently the lowest

among her peers.  *Id*, ¶ 2; Villanueva Decl., ¶ 11.  O'Keefe delayed acting on Villanueva's

recommendation pending completion of the first quarter and the busy holiday season.  O'Keefe

Decl., ¶ 3.

**V.  March 2010 Feedback and Requests for Leave**

      In March 2010, Villanueva provided Weaver with feedback on her performance in an

annual "360 Review."  Villanueva Depo., pp. 14, 65.  The notes regarding Weaver indicate that

she needed to:

> START: Using the feedback module for coaching for performance
> and probing reps for a deeper dive approach and gaining their

> input.  Proactively reach out to be on the TM Supervisor meeting agenda.
> STOP: Allowing day to day to get in the way of driving for team performance.
> CONTINUE: Delivery conselling's [sic] with confidence.  Good preparation for 1 on 1's.  Keeping me informed of team performance.  Connecting with other Supervisors.  Effective team meetings.

Weaver Decl., ¶ 11, Ex. K.[3]

On March 4 and 9, 2010, Weaver underwent a CT scan and an MRI which revealed a fracture or dislocation of her neck.  *Id*, ¶¶ 17-18.  On March 18, 2010, Weaver' health care provider signed a form stating that Waver needed intermittent leave during episodic flare-ups for one to two days up to three times per month, which she did not take.  *Id*, ¶ 18; Crabtree Decl., Ex. A., pp. 29-30.  That same day, Weaver's doctor advised that she needed a fusion in her neck as soon as possible.  Waver Decl., ¶ 19.

On March 21, 2010, Weaver sent an email to HR and Villanueva requesting the paperwork for a leave of absence for the surgery planned for April 16, 2010.  *Id*, ¶¶ 20-21, Ex. L.  The following day, Weaver spoke with Villanueva about her need for surgery, and Villanueva signed Weaver's leave request.  *Id*, ¶ 21.  On March 23, 2010, HR approved Weaver's request for intermittent leave.  *Id*, ¶ 22.

On March 28, 2010, Villanueva said she was pleased with Weaver's work and the numbers her team had posted.  *Id*, ¶ 23.

---

[3]  In its Reply, p. 3 n2, Netflix seeks to strike this document as not properly authenticated, primarily due to a question over its date.  Since the document was produced by Netflix, its motion to strike is denied, but this court will assume, as Netflix contends, that the document was prepared in March 2010.

On March 29, 2010, Weaver learned that her expected time off following surgery would be two to six weeks and passed that information on to Villanueva. *Id*, ¶ 24.

## VI. April 2010 Termination and Surgery

On April 3, 2010, Customer Service Team Manager, Nate Hayward, sent Mercer a recommendation to terminate two CSSs, Jennifer Norman and Mitch Granat, with a short summary of the reasons. O'Keefe Decl., Ex. A, p. 2. Hayward copied that email to O'Keefe, who immediately forwarded the message to Villanueva and asked her to "do the same" for Weaver. *Id*; Villanueva Decl., ¶ 13. On April 5, 2010, Villanueva sent an email to O'Keefe and Mercer recommending Weaver's termination and summarizing her reasons, which "essentially copied" each of the performance criticisms from January 2010. Villanueva Decl., ¶ 13, Exs. D, F. One of the reasons given by Villanueva for recommending termination was Weaver "[n]ot using good judgment when asking for time off." *Id*. Netflix terminated Weaver the following day on April 6, 2010. Weaver Decl., ¶ 25. Netflix terminated three other supervisors the same day,[4] based on what O'Keefe describes as "similar performance-related reasons." O'Keefe Decl., ¶ 4.

Ten days later, on April 16, 2010, Weaver underwent spinal fusion surgery. Weaver Decl., ¶ 27. She was released to work on May 27, 2010. *Id*.

## FINDINGS

Netflix's motion rests on its submission of evidence that Weaver was experiencing performance issues prior to advising Villanueva of her need for medical leave and was slated for

---

[4] Two of the three others terminated were Jennifer Norman and Mitch Granat, but the record does not reveal which other CSS was terminated at that time.

termination based on those preexisting issues.  Based on that evidence, Netflix contends that the

timing of Weaver's request for medical leave in March 2010 is only coincidentally related to her

April 2010 termination.  Netflix seeks summary judgment against each of Weaver's three claims

because she has submitted no evidence to either establish a causal connection between her

request for medical leave and her termination or to counter its facially legitimate reasons for her

termination.  However, a through review of the record reveals evidence sufficient to raise an

inference of a causal link between Weaver's requests for medical leave and her termination

sufficient that her claims survive summary judgment.

## I. __FMLA and OFLA Claims__

### A. __Legal Standard__

In her Second Claim, Weaver contends that Netflix violated OFLA by terminating her

before she could take medical leave to which she was entitled.  The Second Claim is titled as one

for "Discrimination/Retaliation" under OFLA without citing any particular subsection of

ORS 659A.183.  However, Weaver clarified at the hearing that this claim is in fact an

"interference" claim under OFLA, which parallels her "interference" claim under FMLA.  The

Third Claim alleges a violation of FMLA, again without citing a particular subsection of 19 USC

§ 2615.  Weaver titles her Third Claim as one for leave "Denial/Discrimination/ Retaliation" and

contends that Netflix discriminated against her "for inquiring about, asking to take medical leave,

taking FMLA leave, and/or invoking the provisions of the FMLA by terminating her

employment."  Complaint, ¶ 20.

The parties disagree whether OFLA allows a plaintiff to assert a claim for "interference"

and whether the burden-shifting approach should apply to Weaver's OFLA claim, however it is

characterized.[5]  This court, however, need not resolve that thorny issue at this juncture.  The

parties agree that the question presented by Netflix's motion is a straightforward one of

causation.  Netflix contends that Weaver has failed to present a disputed issue of material fact on

the issue of whether her request for medical leave was a negative factor in the decision to

terminate her.  If she has done so, Weaver avoids summary judgment.  If she has not done so,

Netflix is entitled to summary judgment against both the Second and Third Claims.  Though

skating on the thinnest of ice, this court concludes that Weaver's evidence carries her safely past

the summary judgment stage.

**B.  <u>Analysis</u>**

Weaver has three primary pieces of evidence on her side.  First, the timing of her

termination is highly suspect.  O'Keefe's request that Villanueva prepare a termination

recommendation and summary of reasons followed nearly immediately after Weaver told

Villanueva that she would need time off for surgery.  Weaver told Villanueva about her need for

two to six weeks off post-surgery on Monday, March 29, 2010.  Weaver was terminated only

eight days later on April 6, 2010, after a conversation in early April between Villanueva and

O'Keefe.  That conversation took place about a week before Weaver's termination, but after

Villanueva knew about Weaver's request for leave due to her upcoming surgery.  Villanueva

Depo., pp. 45-46.  Netflix attempts to explain away this close temporal proximity, noting that

O'Keefe delayed acting on Villanueva's February 2010 termination recommendation pending

---

[5]  *See Price v. Multnomah County*, 132 F Supp2d 1290, 1296 (D Or 2001) (applying *McDonnell Douglas* burden-shifting to both FMLA and OFLA retaliation claims); *Xin Liu v. Amway Corp* ., 347 F3d 1125, 1135, 1136 n10 (9th Cir 2003) (leaving open the issue of whether *McDonnell Douglas* analysis applies in an anti-retaliation action under FMLA); *Bachelder v. Am West Airlines, Inc.*, 259 F3d 1112, 1125 (9th Cir 2001) (rejecting *McDonnell Douglas* analysis to an interference claim under FMLA).

completion of the first quarter and the busy holiday season.  O'Keefe Decl., ¶ 3.  According to

O'Keefe, Weaver's termination was simply one of a package of terminations of four

underperforming CSSs designed to give Netflix the "best 'go-forward' team in place starting the

second quarter."  *Id*, ¶ 3.  While this is a plausible explanation for the very close timing between

Weaver's revelation of her need for surgery and her termination, another equally plausible

explanation is that Weaver's revelation prompted her termination.

Second, while Netflix asserts that Weaver's team was consistently underperforming

(Villanueva Decl., ¶ 11), it has wholly failed to explain the March 31, 2010 30-day average

scores for Weaver's team.  *See* Villanueva Decl., Ex. G.  The metrics goals reflected for

Weaver's team fall somewhere mid-range for other teams and support Weaver's position that the

metrics goals reached by her team exceeded Netflix's standards.  Weaver Decl., ¶ 28; Villanueva

Decl., ¶ 4.  This information undercuts Netflix's contention that the termination was

performance-based.

Third, one of the reasons specifically given to justify Weaver's termination was that she

did not use "good judgment when asking for time off."  Villanueva Decl., Ex. F, p. 1.  It is true

that "Attendance – judgment" was one of the areas that Villanueva discussed with Weaver when

giving her feedback on her performance on January 20, 2010, which Villanueva relates to

Weaver's request for time off in 2009 both shortly after being promoted and during Netflix's

busiest season.  *Id*, ¶ 14, Ex. D.  Netflix contends that the termination for not using good

judgment when asking for time off relates back to that January 2010 criticism.  However, Weaver

avers that she went through the appropriate procedures in requesting and obtaining her leave

starting in November 2009, was never written up for making that request, and was never told she would be disciplined for making that request.  Weaver Decl., ¶ 9.

The only documented leave requests reflected in the record after December 2009 are the March 18, 2010 request indicating that Weaver would need intermittent leave and the March 22, 2010 request submitted to cover Weaver's upcoming surgery from April 17 to May 17, 2010.  It is just as – or perhaps more – plausible that the reference to not using "good judgment when asking for time off" relates to these March 2010 leave requests made only two or three weeks earlier, rather than to Weaver's 2009 leave request made nearly four months earlier.  At this juncture, this court must draw all inferences in Weaver's favor and, therefore, cannot lightly dismiss this reference as simply an unfortunate byproduct of what Villanueva asserts was a cut-and-paste summary of reasons for Weaver's termination.

Finally, Weaver points out that she had received no prior written discipline and had been complimented by Villanueva on her job performance shortly before her termination.  In addition, Villanueva failed to consider any disciplinary option other than termination, even though she had earlier demoted a male CSS back to CSR for poor performance and even though Mercer had earlier suggested that she consider such options.  Villanueva Depo., p. 26; Mercer Depo., pp. 63-65.

In sum, the present record reflects sufficient evidence of a causal connection between Weaver's request for medical leave in March 2010 and her termination the first week of April 2010 to preclude summary judgment.

///

///

12 - FINDINGS AND RECOMMENDATION

## II.  **Wrongful Discharge Claim (First Claim)**

"Invoking rights to benefits under FMLA and OFLA is an employment-related right that may serve as the basis for a wrongful discharge claim."  *Lawson v. Walgreen Co.*, Case No. CV 07-1884-AC, 2009 WL 742680, at *12 (D Or March 20, 2009) (citations omitted).  Netflix's argument against Weaver's First Claim for wrongful termination rests on the same premise as its argument against the FMLA and OFLA claims, namely that Weaver has failed to show causation. For the same reasons discussed above, Weaver's First Claim survives this challenge.

## **RECOMMENDATION**

For the above reasons, Netflix's Motion for Summary Judgment (docket #13) should be DENIED.

## **SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due September 2, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day of August, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge